J-A22040-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.J.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.L.F., MOTHER | : | No. 608 MDA 2020 |

Appeal from the Decree Entered March 17, 2020
In the Court of Common Pleas of Lancaster County
Orphans' Court at No: 2486 of 2019

BEFORE: SHOGAN, J., STABILE, J., and MURRAY, J.

MEMORANDUM BY STABILE, J.:                    **FILED OCTOBER 14, 2020**

J.L.F. ("Mother") appeals from the decree entered on March 17, 2020, which terminated involuntarily her parental rights to her daughter, A.J.C. ("Child"), born in October 2017.[1]  After careful review, we affirm.

The record reveals that the Lancaster County Children and Youth Social Service Agency ("CYSSA") has a lengthy history of involvement with Mother dating back to 2005, due to her substance abuse and medical neglect of her first child.  N.T., 2/4/20, at 60.  CYSSA became involved with Mother a second time in 2015, after it learned that she had been charged with endangering the

---

[1] The orphans' court entered a separate decree terminating involuntarily the parental rights of Child's father, D.C. ("Father").  Father appealed at Superior Court docket number 595 MDA 2020.  We address his appeal in a separate memorandum.

welfare of a different child.[2]  ***Id.*** at 60-61.  She was indicated as a perpetrator of abuse regarding that child.  ***Id.*** at 61.

CYSSA became involved with Mother yet again following Child's birth in October 2017, when it received a report indicating that Father had overdosed in the hospital.  ***Id.*** at 58.  CYSSA implemented a safety plan, which it lifted in December 2017, based on Mother's compliance with services.  ***Id.*** at 59. However, on August 30, 2018, CYSSA received another report indicating that Mother overdosed, and that Father "left [Child] at a crack house."[3]  ***Id.*** at 57-

---

[2] This charge arose from an incident during which Mother was intoxicated and left the child "outside at night and there was [*sic*] cars coming by."  N.T., 2/4/20, at 60-61.

[3] The CYSSA caseworker testified that Mother did not overdose but suffered a seizure.  N.T., 2/4/20, at 72.  Further, CYSSA presented the expert testimony of psychologist, Jonathan Gransee, Psy.D., who performed parental capacity assessments of Mother and Father.  Dr. Gransee's report regarding Father also states that Mother suffered a seizure, based on a conversation with the CYSSA caseworker.  Petitioner's Exhibit 4 at 8.  Despite this evidence, the orphans' court indicates in its opinion that Mother's claim she suffered a seizure has "not been credibly substantiated."  Orphans' Court Opinion, 3/17/20, at 1.

Notably, Dr. Gransee's report casts doubt on the allegation that Father left Child at a "crack house" as well.  The report states:

> [T]here were allegations that [Father] had left his daughter at a "crack house;" he stated this was a friend['s] house, and not a crack house. (His caseworker stated "it was never amended", but she believes that he is correct, but the parents never contested the statements in the report, so it has never been amended.  She stated that it was still the case that [Father] did not make a wise choice as to whom he left the child with).

Petitioner's Exhibit 4 at 2.

- 2 -

58. CYSSA obtained custody of Child that same day. *Id.* at 57. The juvenile court adjudicated Child dependent on September 19, 2018. *Id.* at 80.

Following the adjudication of dependency, Mother made little progress toward achieving reunification with Child. She was charged with endangering the welfare of children due to her substance abuse and resulting neglect of Child, and pled guilty. Petitioner's Exhibit 5 (documents related to Mother's criminal conviction). Mother was incarcerated in December 2018, and she remained incarcerated throughout Child's dependency. N.T., 2/4/20, at 73. On October 11, 2019, CYSSA filed a petition to terminate her parental rights to Child involuntarily.

The orphans' court conducted a hearing on CYSSA's termination petition on February 4, 2020. Following the hearing, on March 17, 2020, the court entered a decree terminating Mother's parental rights. Mother timely filed a notice of appeal on April 14, 2020, along with a concise statement of errors complained of on appeal.

Mother now raises the following claim for our review:

> Whether the [o]rphan's [c]ourt erred in its Decree dated March 17, 2020, that [CYSSA] had met its burden in proving that Mother's parental rights should be terminated when there was evidence she was working on and completing her goals on her child permanency plan throughout her incarceration and would be released soon[?]

Mother's Brief at 8.

We review Mother's claim in accordance with the following standard of review:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Section 2511 of the Adoption Act governs the involuntary termination of parental rights. *See* 23 Pa.C.S.A. § 2511. It requires a bifurcated analysis:

. . . . Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the orphans' court terminated Mother's parental rights to Child pursuant to Section 2511(a)(1), (2), (5), (8), and (b). We need only agree with the court as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super.

2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Here, we analyze the court's decision pursuant to Section 2511(a)(2) and (b), which provides as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> \*\*\*
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> \*\*\*
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

We first consider whether the orphans' court abused its discretion by terminating Mother's parental rights to Child pursuant to Section 2511(a)(2). Our analysis is as follows:

> . . . . In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1)

repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted). Significantly, "a parent's incarceration is relevant to the [S]ection [2511](a)(2) analysis and, depending on the circumstances of the case, it may be dispositive of a parent's ability to provide the 'essential parental care, control or subsistence' that the section contemplates." *In re A.D.*, 93 A.3d 888, 897 (Pa. Super. 2014) (citation omitted).

In her brief, Mother argues that the orphans' court discounted testimony favorable to her regarding her progress in substance abuse treatment, among other things. Mother's Brief at 11-19. Mother also complains that the court placed weight on factors that were beyond her control while she remained incarcerated, including her lack of visits with Child and delayed enrollment in a parenting program. *Id.* at 15. She asserts that she requested visits with Child and attempted to maintain a relationship with her. *Id.* at 11, 14-16.

The orphans' court explained its decision to terminate Mother's parental rights to Child pursuant to Section 2511(a)(2) as follows:

Here, Mother['s] and Father's extended period[s] of recent incarceration clearly rises to the level of . . . continued incapacity. As discussed previously, the parents have failed to provide any parental care to the Child except during the one visit they were each able to have with the Child in 2018. While Mother and Father are hopeful that they will regain the ability to parent their Child, no credible evidence has been presented sufficient to demonstrate that Mother or Father will be able to maintain a life of sobriety and financial stability that is necessary for the upbringing of a child. Therefore, the court is satisfied that [CYSSA] has proven, by clear and convincing evidence, that termination of Mother's and Father's parental rights is warranted pursuant to Section 2511(a)(2).

Orphans' Court Opinion, 3/17/20, at 13.

Our review of the record supports the decision of the orphans' court. As summarized above, CYSSA has a lengthy history of involvement with Mother dating back to 2005, due to her substance abuse and medical neglect of her first child. N.T., 2/4/20, at 60. CYSSA became involved with Mother a second time in 2015, when she was charged with endangering the welfare of a different child. *Id.* at 60-61. Mother was indicated as a perpetrator of abuse regarding that child. *Id.* at 61.

CYSSA became involved with Mother yet again following Child's birth in October 2017, when it received a report that Father overdosed in the hospital. N.T., 2/4/20, at 58. Child then entered foster care on August 30, 2018, after CYSSA received a second report indicating that Mother overdosed, and that Father "left [Child] at a crack house." *Id.* at 57-58. Although it appears that this second report was inaccurate, the record confirms that Mother was in no position to provide appropriate parental care at the time of Child's placement.

Mother was arrested in December 2018 and charged with endangering Child's welfare, to which she pled guilty. Petitioner's Exhibit 5. The information containing Mother's charge states that she endangered Child between March and August 2018, "by frequently being under the influence of drugs or alcohol, to a degree that [she] was unable to care for [Child's] basic needs including supervision, feeding and hygiene." *Id.* Mother was incarcerated in December 2018 and remained incarcerated during the termination hearing on February 4, 2020. *Id.* at 62, 72-73.

While incarcerated, Mother made little progress toward addressing her history of substance abuse and other parenting deficits. Mother completed a substance abuse treatment program during her incarceration, and participated in something called the "Living Safely" program, but reported that she had been unable to participate in a parenting program.[4] *Id.* at 73-76, 93-94. In addition, despite completing a substance abuse treatment program during her incarceration, Mother acknowledged that she would need extensive additional substance abuse treatment. She testified that she would complete the Living Safely program and be released on approximately March 24 or 25, 2020, after which she planned to attend an inpatient rehabilitation facility. *Id.* at 97-98. Mother anticipated that she would spend forty-five to sixty days at the facility

_____

[4] During the hearing, Mother presented an exhibit indicating that she would begin attending a parenting program on February 13, 2020. N.T., 2/4/20, at 93; Exhibit M-2.

- 8 -

and then go to a halfway house, "or the [community corrections center] until I could get into a women's and children's center and just continue to work to get my daughter back." *Id.* Thus, by Mother's own admission, she remained incapable of parenting Child at the time of the termination hearing, and could not or would not remedy her parental incapacity in the foreseeable future.

Importantly, CYSSA also presented the expert testimony of Dr. Gransee, who opined that Mother lacked parental capacity at the time he evaluated her in March 2019. *Id.* at 14, 17. Dr. Gransee testified that Mother's recent actions gave him "a lot of hope[,]" but that it would take approximately a year before she would be in a position to parent Child, at the earliest. *Id.* at 20, 40. He explained, "If she were to snap to it really quickly, she could probably be up and running within a year. If she fights the process, there's no telling." *Id.* at 20. In light of this evidence, we discern no abuse of discretion by the orphans' court in terminating Mother's parental rights to Child pursuant to Section 2511(a)(2), and we affirm that portion of the court's March 17, 2020 decree.

We next consider whether the orphans' court abused its discretion by terminating Mother's parental rights to Child pursuant to Section 2511(b). We apply the following analysis.

> . . . . Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond,

if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the [S]ection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (quotation marks and citations omitted).

Mother waived any challenge to Section 2511(b) by failing to include and develop it in the argument section of her brief. *See In re M.Z.T.M.W.*, 163 A.3d 462, 465 (Pa. Super. 2017) ("[T]his Court will not review a claim unless it is developed in the argument section of an appellant's brief, and supported by citations to relevant authority.").

Even if Mother had preserved a claim regarding Section 2511(b) for our review, we would conclude that it does not entitle her to relief. Mother has had no contact with Child since a visit on October 2, 2018, when Child was

approximately one year old.[5] N.T., 2/4/20, at 68. In contrast, Child has spent her entire placement in foster care residing in the same foster home, which is potentially a permanent home. *Id.* at 70-71. By the time of the hearing on February 4, 2020, Child had spent over half of her life in the foster home and referred to her foster parents as "mommy" and "daddy." *Id.* at 71, 87. It is clear that Child shares a meaningful bond with her foster parents and not with Mother. *See In re K.Z.S.*, 946 A.2d 753, 764 (Pa. Super. 2008) (observing that the relationship between K.Z.S. and his mother must have been "fairly attenuated," given that K.Z.S. had been in foster care for most of his young life, and had only limited contact with his mother during that time); *see also Matter of Adoption of M.A.B.*, 166 A.3d 434, 449 (Pa. Super. 2017) ("[A] child develops a meaningful bond with a caretaker when the caretaker provides stability, safety, and security regularly and consistently to the child over an extended period of time."). Thus, termination of Mother's parental rights would best serve Child's needs and welfare pursuant to Section 2511(b).

---

[5] Mother asserts in her brief on appeal that she "always requested visitation even though incarcerated, but limited visitation was only provided one time while incarcerated." Mother's Brief at 15. Our review of the record does not support this assertion. The CYSSA caseworker testified that Mother did not have visits with Child during her incarceration, "because of the offenses and the location of being incarcerated," and did not state that Mother had ever requested visits. N.T., 2/4/20, at 68, 73. Similarly, Mother testified that she did not have visits with Child, and agreed that she "would have wanted" to visit, but did not state that she requested visits. *Id.* at 99-100. Even if Mother had requested visits, that would not change our analysis and conclusions.

Based on the foregoing analysis, we conclude that the orphans' court did not abuse its discretion by terminating Mother's parental rights to Child involuntarily, and we affirm the court's May 17, 2020 termination decree.

Decree affirmed.

Judge Murray joins the memorandum.

Judge Shogan concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/14/2020